UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JACQUELINE GREEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 04 C 5109 |
| v. | ) |
| | ) Judge John W. Darrah |
| ILLINOIS DEPARTMENT OF CHILDREN AND | ) |
| FAMILY SERVICES, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jacqueline Green, filed suit against Defendant, the Illinois Department of Children and Family Services ("DCFS"), alleging race discrimination, retaliation, and a hostile work environment. Presently before the Court is DCFS's Motion for Summary Judgment.

### BACKGROUND

Green, an African-American, began her employment with DCFS in January 1991. (Def.'s 56.1 Statement ¶¶ 5, 11). Jacqueline Wert, Public Service Administrator and Supervisor of the Adoptions Unit, was Green's direct supervisor from 1997 through July 2000. (Id., ¶ 8). Marilyn Hyde was a Field Service Manager from approximately 1995 until March 2000. During that time, Hyde supervised Wert's adoption team and directly supervised Wert. (Id., ¶ 9). Michael Barry was a Field Service Manager and supervised Wert's adoption team beginning in March 2000, when Hyde was promoted to Program Manager. (Id., ¶ 11). Christine McGrath was Regional Administrator for the Cook County North region. McGrath was responsible for four key managers, one of which was the Program Manager who dealt with field operations, which included all case-carrying staff. (Id., ¶ 12).

On several occasions between September 1992 and November 1993, Green had "communication problems" with her supervisor, Ms. Neely. (Def.'s 56.1(a)(3) Statement ¶ 14). Ms. Neely noted in Green's 1992-93 performance review that Green "displayed disrupted behavior that was unwarranted." (Id., ¶ 15). Following her transfer from Ms. Neely's team in 1994, Green had issues with her subsequent supervisor, Mr. Menard. (Id., ¶16). Green believed that Mr. Menard was a "racist" and a "bigot." (Id., ¶ 17). In 1996, Green had issues with her then-supervisor, Ms. Bailey, in that Ms. Bailey's "way of communicating to the team was, like, yelling and hollering and screaming." (Id., ¶ 18).

In 1997, Green transferred to the Adoption Unit under the supervision of Wert. (Def.'s 56.1(a)(3) Statement ¶ 19). As Adoption Team Supervisor, Wert supervised a team of approximately six Child Welfare Specialists who facilitated adoptions. Between 1997 and 2000, Wert supervised the following Child Welfare Specialists: Green, Randee Britt (Caucasian), Ursula Angielski (Caucasian), Reese Nichols (African-American), Armando Castro (Hispanic), and Sadie Williams (African-American). Esther Jones (African-American) was the Administrative Assistant during this time frame. (Id., ¶¶ 20, 22). The Child Welfare Specialists in the Adoption Unit acted as "liaisons" to provide consultation and information to families and accompanied placement workers on family visits to discuss the adoption process. The liaisons also assisted the placement workers in the completion of the adoption paperwork. (Id., ¶ 21). Green's performance reviews for 1996 through 1999 indicate that she either met or exceeded expectations. (Plaint.'s 56.1(b)(3) Statement ¶¶ 59-60). Green's performance review for 2000 indicates that she met expectations in seven categories and needed improvement in "human relations." (Id., ¶ 61).

2

Wert had an "open-door-policy" where her members could discuss their work with Wert at any time. (Def.'s 56.1(a)(3) Statement ¶ 23). Green met with Wert throughout Green's employment in Wert's unit. (Id., ¶ 24). Wert avers that she rarely transferred a direct service case within her unit unless administration directed her to do so. However, Green avers that Wert transferred nearly complete cases to non-African-American team members shortly before closure of the case so the closure would be credited to the member who just recently received the transferred case. (Id., ¶¶ 25-28; Plaint.'s Response ¶¶ 25-28). Other African-American employees filed complaints against Wert, alleging discrimination, in 1996, 2000, and 2001. (Plaint.'s 56.1(b)(3) Statement ¶ 10).

In February 1999, Nichols sent a letter to Al Lambert, Chief of the DCFS Affirmative Action Office, regarding Nichols' concerns about the "ill will" of Wert that was "race and gender based in nature." (Plaint.'s 56.1(b)(3) Statement ¶ 11). In September 1999, Nichols sent a memo to Wert, with a copy to Hyde, regarding the "double standard" that divides the Adoption Unit along racial lines and maintains a hostile work environment. (Id., ¶ 12). Later that same month, Nichols prepared a memo, entitled "Petition for Redress of Grievance." Nichols' memo noted a double standard that divided the team along racial/ethnic lines and which created a "privilege for white and Hispanic team members" to the exclusion of African-American members of the team. Nichols believes that he sent the memo to Hyde and hand-delivered the memo to Lambert. Hyde does not recall receiving Nichols' memo, and Lambert only recalls having a discussion with Nichols about the general issues discussed in the memo. (Id., ¶ 13; Def.'s Response ¶ 13).

In October 1999, Nichols sent a follow-up memo to Hyde, requesting a meeting to review the latest memo. Hyde denies receiving this follow-up memo. (Plaint.'s 56.1(b)(3) Statement ¶ 17; Def.'s Response ¶ 17). In May 2000, Nichols sent another memo to Lambert, regarding "Hostile

3

Work Environment Due to Discriminatory Practices" that described Nichols' observations regarding Wert's "disaffinity for African-Americans which maintained a general hostile work environment for those of us under her supervision." Lambert denies receiving the memo. (Plaint.'s 56.1(b)(3) Statement ¶ 18; Def.'s Response ¶ 18). Nichols' May 2000 memo was prompted by an incident where he noticed that an African-American family with three children was slated for adoption subsidy benefits, which Wert refused to approve but that Wert improperly approved subsidy benefits to a white family with one child who did not qualify for the subsidy benefits. (Plaint.'s 56.(b)(3) Statement ¶ 19).

As an adoption liaison, Green worked "out in the field," making home visits to families and children at least two or three times per week. (Def.'s 56.1(a)(3) Statement ¶ 29). Wert recalls calling Green one time when Wert's supervisor needed some information. Green recalls Wert's calling while she was out in the field five or six times. (Id., ¶ 30; Plaint.'s Response ¶ 30). Hyde recalls periodically asking Wert to contact members of her unit while they were out in the field. (Def.'s 56.1(a)(3) Statement ¶ 31). Nina Walton, who accompanied Green on her family visits approximately twice a month, recalled one telephone call from Wert to Green. (Id., ¶ 33).

Wert also had responsibility for approving adoption subsidies. (Def.'s 56.1(a)(3) Statement ¶ 35). Wert has approved hundreds of subsidies and does not recall ever denying a subsidy to any child, although she does recall returning paperwork to members of her unit for changes and corrections. (Id., ¶ 37). Green avers that Wert showed favorable treatment toward Caucasian families when she approved subsidies and that Wert denied subsidies to African-American children.

4

(Plaint.'s Response ¶¶ 34, 37). Wert's decisions regarding subsidies were reviewed by her supervisors and were subject to state and federal auditors. (Def,'s 56.1(a)(3) Statement ¶ 40). Hyde reviewed subsidies and consulted with Wert when there were questions or concerns about the subsidy. (Id., ¶ 39).

In 1999, the DCFS Adoption Program began preparing for an accreditation process. (Def.'s 56.1(a)(3) Statement ¶ 42). The Council of Accreditation for Children and Family Services ("COA") is an independent accrediting body for groups that provide behavioral health and social services. Completing the accreditation process and passing the review signals to the community that an agency is competent and is a reliable source of service and provides an agency clear guidelines to reach and maintain a high quality of service and practice. (Id., ¶ 43). Preparing for the accreditation process included all-staff meetings, training, peer reviews, and inclusion of field teachers. (Id., ¶ 44). Craig Perri was the field teacher assigned to Wert's Adoption Unit to help them prepare for the accreditation process. (Id., ¶ 45). Activities with Perri included teaching concepts of quality insurance and quality assurance ("QI/QA"), reviewing existing procedures, and finding better ways to provide and document service. (Id., ¶ 46).

While Hyde was a Field Service Manager, Green complained to her about how Green was treated by Wert. (Def.'s 56.1(a)3) Statement ¶ 93). Green expressed concerns to Hyde about the unit's transfer to an adoption "liaison" status and told Hyde that she was being requested to do work that she should not be doing and that the demands on her were unrealistic. (Id., ¶ 94). The parties dispute whether Green complained to Hyde that Wert was discriminating against Green because of her race. (Id., ¶ 95; Plaint.'s Response ¶ 95).

5

Wert held team meetings, beginning in 1999, as part of preparing for the accreditation process. (Def.'s 56.1(a)(3) Statement ¶ 47). Attendance at the team meetings was required of all case workers because the meetings served an important function in the day-to-day operations of DCFS and were an important avenue for the dissemination of information to case workers. (Id., ¶ 48). Team meetings are also the basic component of Continuous Quality Improvement ("CQI"), which is a requirement of the accreditation process. The focus of the CQI process is improving services to clients. (Id., ¶ 49). On August 3, 1999, Green sent a memo to Wert regarding Wert's favoritism toward certain workers, including how Wert allowed the continued absences of Castro from "mandatory" team meetings and Wert's "checking up" on Green during Green's home visits. (Plaint.'s 56.1(b)(3) Statement ¶ 32).

On March 8, 2000, Wert convened a team meeting to specifically discuss the concepts of QI/QA. (Def.'s 56.1(a)(3) Statement ¶ 52). During this meeting, Green described problems that she was experiencing with Jones, who was present at the meeting. (Id., ¶ 52). Wert told Green that the problem with Jones was a personal conflict rather than a QI/QA issue. (Id., ¶ 54). Green became upset that Wert had prohibited her from discussing her problem with Jones and excused herself from the meeting. (Id., ¶ 55). When Green excused herself from the meeting, she told Wert that she excused herself because things were "getting out of control" and that Wert kept hollering and yelling at Green instead of listening to Green. (Plaint.'s 56.1(b)(3) Statement ¶ 26.) The team meeting continued for approximately another thirty minutes after Green's departure. (Def.'s 56.1(a)(3) Statement ¶ 56). Nichols was present at the March 8, 2000 meeting and observed that Green attempted to provide input into the meeting and that Green told Wert she was "sick of" Wert's

always appreciating the input of Angielski and Britt but always treating the comments of Nichols and Green "like it is a problem." (Plaint.'s 56.1(b)(3) Statement ¶ 24).

Immediately after the March 8, 2000 meeting, Green wrote and sent a memo to Wert regarding quality improvement issues and certain concerns that Green had, including the division of the team and, what Green considered, unfair treatment. Green told Wert that she felt that Wert ignored Green's concerns during team meetings in favor of the white team members. On March 9, 2000, Green wrote another memo to Wert, describing Green's issues and Wert's discriminatory conduct. Green sent a copy of the March 9, 2000 letter to McGrath and Hyde. (Plaint.'s 56.1(b)(3) Statement ¶ 31). On March 14, 2000, Green wrote and sent a memo to McGrath, with a copy to Wert, addressing Green's issues regarding the team and a meeting involving McGrath that took place on March 10, 2000 about such issues. Green stated that none of the issues she raised were resolved and asked that she be excused from team meetings until the issues were resolved and until she was treated fairly. (Id., ¶ 35). McGrath does not recall any particular conversations with Green on March 10 about issues affecting the team and does not recall any conversations with Green following the March 14 memo. (Id., ¶¶ 36-37).

Other than Green, Wert did not supervise an employee who refused to attend team meetings. (Def.'s 56.1(a)(3) Statement ¶ 158). Barry is also unaware of any other DCFS employee who refused to attend team meetings. (Id., ¶ 159). Wert's policy with respect to attendance at team meetings was to follow up with anyone who missed a meeting, find out where they were, and find out what happened. (Id., ¶ 160). All team members were expected to attend team meetings unless they had a legitimate reason for not attending. (Id., ¶ 161). Castro, another employee that reported to Wert, did miss team meetings. On those occasions that Castro did not have approval to miss a meeting but

7

did miss the meeting, Wert confronted Castro, who offered an explanation for his absence and assured Wert that it would not happen again. (Id., ¶¶ 163-165).

While she supervised Wert's Adoption Unit, Hyde had discussions with Nichols, during which time Nichols expressed that he was not fully utilized as a supervisor in Wert's absence. (Def.'s 56.1(a)(3) Statement ¶ 173). Hyde told Nichols that his performance needed to improve before he would be fully utilized as a supervisor. (Id., ¶174). Wert never made any racial or offensive comments to Nichols, and she did not discipline Nichols in any manner. (Id., ¶¶ 176-177). Nichols never refused to attend a team meeting, and any meetings that he did miss were excused. (Id., ¶ 179). Nichols never filed a charge of discrimination against DCFS with either the Equal Employment Opportunity Commission or IDHR. (Id., ¶ 181). Nichols observed the interaction between Wert and Green and found that Wert was generally rude to Green. (Plaint.'s 56.1(b)(3) Statement ¶¶ 22-23).

On March 10, 2000, a meeting of the Adoption Unit was convened by McGrath in response to concerns from the unit regarding the Quality Improvement ("QI") process, the field teaching method, and some other staff concerns. (Def.'s 56.1(a)(3) Statement ¶ 57). McGrath also wanted to address her concern that personnel issues were being discussed during team meetings. (Id., ¶ 58). During the March 10 meeting, McGrath spoke about the accreditation process, the QI/QA process, and a site visit by the accreditors in May 2000. (Id., ¶ 59). McGrath also told Wert's team that Michael Barry, who replaced Hyde as Field Service Manager, would meet individually with the staff to discuss any interpersonal problems within the team. (Id., ¶ 60).

On March 14, 2000, Green sent a memo to McGrath asking, to be excused from further team meetings until her "issues" were resolved. (Def.'s 56.1(a)(3) Statement ¶ 61). Wert sent three

8

separate e-mails to her staff, directing them to attend team meetings to be held on March 22, 2000, March 29, 2000, and April 5, 2000 . (Id., ¶¶ 64, 67, 71). Green did not attend these three meetings. The parties dispute whether Green was in her office when the meetings took place and whether Green received any of the e-mails. McGrath never told Green she was excused from the team meetings. (Def.'s 56.1(a)(3) Statement ¶ 76). Green concedes that she did not check her e-mail on a regular basis. (Id., ¶ 74). Green had notified Wert that Green was waiting for a response from McGrath regarding her request to be excused from the team meetings. (Plaint.'s 56.1(b)(3) Statement ¶ 47).

On March 27, 2000, Green sent Wert a memo about the concerns and issues that she had provided to Wert and McGrath on March 9, 2000, requesting that Wert address those issues. Wert did not have an individual dialogue with Green and, instead, insisted that the team meeting would have been an opportunity to resolve the issues. (Plaint.'s 56.1(b)(3) Statement ¶ 54). On March 29, 2000, Green sent a memo to Wert regarding Green's efforts to attend the March 29 meeting and Green's ongoing concerns regarding her treatment on the team. Green stated that the treatment she was receiving was very stressful, mentally abusive, humiliating, and insulting. (Id., ¶ 55).

On April 5, 2000, Wert consulted with her immediate supervisor, who told Wert to contact Rick Navarro of Labor Relations to further discuss the Green matter. (Def.'s 56.1(a)(3) Statement ¶ 85). That same day, Wert contacted Navarro. (Id., ¶ 86). At the request of her supervisor, Wert also wrote a memo to Barry, outlining the events leading to Green's refusal to attend the team meetings. (Id., ¶ 87). After reviewing the information Wert provided, Navarro made a recommendation as to the appropriate discipline, taking into account the union contract and

9

personnel rules. (Id., ¶ 88). Other than confirming the facts upon request, Wert did not participate in the decision to discipline Green; and Wert was not authorized to make decisions regarding discipline. (Id., ¶ 89). Wert did not have any conversation with Green regarding Green's concerns raised in her March 9 memo. (Plaint.'s 56.1(b)(3) Statement ¶ 57).

On April 10, 2000, Green met with Barry. (Def.'s 56.1(a)(3) Statement ¶ 78). Barry told Green that she could not be excused from the team meetings. (Id., ¶ 80). At the request of McGrath, Barry also conducted individual interviews with each of the other members of the Adoption Unit on April 10, 11, and 14, 2000. (Id., ¶ 81). Through the interviews, Barry discovered that two African-American members of the Adoption Unit, Green and Nichols, believed that they were discriminated against, while two other African-American members of the unit did not believe that they were discriminated against. (Id., ¶ 82). Barry's notes from meeting with Green include notations that team meetings were "humiliating," African-Americans were deprived of feedback on home studies from the field teacher for the team, Wert treated white adoptive families better than she treated African-American families, and that Wert treated Green "less than dirt." (Plaint.'s 56.1(b)(3) Statement 42). Barry's notes from his meeting with Nichols include notations that there was favoritism to white children in the award of subsidies and school-related field placements, that African-American members were held strictly accountable and harassed as compared to white members, and that praise was given to white members but intolerance was given to African-Americans. Nichols also provided Barry with ten memos he had written, dating back to May 1999. (Id., ¶ 43). Barry also discovered that some Adoption Unit members felt that team meetings were

10

disrupted by Green's outbursts and desire to control the team meeting's agenda. (Def.'s 56.1(a)(3) Statement ¶ 83). After the interviews, Barry discussed his findings with Wert, and possibly McGrath and Lambert. (Id., ¶ 84).

Following Green and Barry's April 10 meeting, Green wrote a memo to Barry, noting that a meeting took place and that Barry was not sure if there was going to be a thorough investigation of the allegations of Wert's discriminatory conduct. (Plaint.'s 56.1(b)(3) Statement ¶ 51). Green's memo also stated that Barry told Green that he expected Green to comply with the requirement of the policy to attend team meetings and that Green expected Barry to comply with federal law prohibiting discrimination. (Id., ¶ 52).

On April 20 and 24, 2000, Barry presided over Green's Pre-Disciplinary Meeting. (Def.'s 56.1(a)(3) Statement ¶ 90). Green was subsequently disciplined for insubordination for refusing to attend team meetings. (Id., ¶ 91). Green received a notice of suspension in April 2000, following the Pre-Disciplinary Meeting. (Id., ¶ 92). Green was suspended for three days for not attending the March 22, March 29, and April 5, 2000 meetings. (Plaint.'s 56.1(b)(3) Statement ¶ 53).

On March 30, 2000, Lambert told Green that she should file a formal grievance or discrimination complaint. (Def.'s 56.1(a)(3) Statement ¶ 97). Navarro also told Green, on April 11, 2000, that she should contact Lambert regarding any issues with discriminatory practices. (Id., ¶ 98). On April 24, 2000, Lambert told Green that she should complete a formal discrimination complaint form. (Id., ¶ 99).

Subsequently, Green filed an internal complaint of discrimination, dated April 17, 2000, using the form recommended by Lambert. (Def.'s 56.1(a)(3) Statement ¶ 100). Lambert received the complaint on April 24, 2000. (Id., ¶ 101). On May 19, 2000, Lambert contacted Green to

11

schedule a time for a meeting regarding her complaint. On May 22, 2000, Lambert met with Green for two hours to discuss Green's allegations. (Id., ¶ 102). Lambert believes he met with Green one additional time in late May; Green does not recall a second meeting. (Id., ¶ 103; Plaint.'s Response ¶ 103). Lambert also interviewed each employee of the Adoption Unit, including Wert. (Def.'s 56.1(a)(3) Statement ¶ 104). On August 16, 2000, Lambert informed Green that he had investigated her complaint and that he had found insufficient evidence to support her allegations of discrimination. (Id., ¶ 105).

In May 2000, Green filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR"). (Def.'s 56.1(a)(3) Statement ¶ 106). During the course of the investigation of Green's charge of discrimination, Green accused the IDHR investigator assigned to Green's case of lying. Green also told the IDHR that: Barry made false statements; McGrath, Wert, and Wert's father were racists; and Hyde lied. (Id., ¶ 107). The IDHR did not find that Green had been discriminated against. (Id., ¶ 109).

Right after March 2000, Green made the decision to try to transfer from the Adoption Unit. (Def.'s 56.1(a)(3) Statement ¶ 110). Effective August 1, 2000, Green transferred to the Licensing Unit. Green's new supervisor was Silvia Camacho. (Id., ¶ 111). After her transfer, Green did not have any further contact with Wert. (Id., ¶ 112). Green alleges that Camacho also yelled and hollered at Green, just as Wert had yelled and hollered at her. (Id., ¶ 113). Wert does not recall Camacho's ever asking Wert for any particular comments about Green. (Id., ¶ 115). Green did not discuss her discrimination claims against Wert with Camacho. (Id., ¶ 116). No supervisor verbally criticized or threatened Green for filing a charge of discrimination with the IDHR. (Id., ¶ 117).

Effective June 15, 2001, Green accepted a position at the Illinois Department of Corrections as a probation officer. (Def.'s 56.1(a)(3) Statement ¶ 118). Green could not meet the requirements to remain at the Department of Corrections because she could not pass the weapons exam. (Id., ¶ 119). When she could not remain at the Department of Corrections, Green returned to her former position as a Child Welfare Specialist II at DCFS, under a new supervisor, Luis Carrion (Hispanic). (Id., ¶ 120). In May or June 2001, Carrion had replaced Camacho as Green's supervisor in the Licensing Unit. (Id., ¶ 121). Green did not like working in the Licensing Unit because she did not believe that the assignments she received were in her job description. (Id., ¶ 122). The only members in Carrion's unit were Green and Arthur Bryson, who is African-American. (Id., ¶ 123).

Green alleged that Carrion discriminated against her and harassed her because: Carrion did not holler at Bryson, Carrion threw paperwork at Green, Carrion did not invite Green to lunch, and Carrion told Green that she needed to do things a certain way. (Def.'s 56.1(a)(3) Statement ¶¶ 124, 126). Carrion disputes Green's allegations. (Id., ¶ 127). Carrion did meet with Green on at least one occasion to counsel her regarding inappropriate behavior and the need to follow the instructions of her supervisor. (Id., ¶ 128). Green did not file a new charge of discrimination against Camacho or Carrion and does not recall ever informing Lambert that she felt discriminated against or retaliated against by Camacho or Carrion. (Id., ¶¶ 129-130). Carrion does not recall ever meeting with Green and Green's complaining to him that she felt she was treated differently than her co-worker, Bryson. Green avers that she did speak to Carrion about her belief she was treated differently than Bryson. (Id., ¶¶ 131-132). Neither Camacho nor Carrion ever made a racist remark to Green. (Id., ¶¶ 133-134).

13

After transferring from Wert's unit, Green applied for promotions to certain supervisory positions at DCFS. (Def.'s 56.1(a)(3) Statement ¶ 135). Due to standards dictated by the accreditation process, a Masters Degree in Social Work ("MSW") or an equivalent degree is required for supervisory positions at DCFS. (Id., ¶ 136). Green does not have a MSW, but she does have a Masters Degree in Guidance and Counseling from Chicago State University. (Id., ¶ 137; Plaint.'s Response ¶ 137).

From 1994 to 2004, Fannie Blake, an African-American, was the Administrator of the Emergency Reception Center ("ERC"). During that time, Blake was involved in the promotion process. (Def.'s 56.1(a)(3) Statement ¶ 138). Through the Illinois Department of Central Management Services, Green received a grade of "well qualified" for a Public Service Administrator ("PSA") position. However, that grade did not mean that Green was automatically qualified for a supervisory position at DCFS. (Id., ¶ 139). The ERC and PSA supervisory positions for which Green applied required a MSW or equivalent degree. (Id., ¶ 140). Green applied for an ERC supervisor position in April 2000. (Id., ¶ 142). On May 3, 2000, she was informed she was not eligible for the position because her degree and transcripts did not meet COA standards. (Plaint.'s Response ¶ 142). In June and August 2000, Green applied for a PSA position but was not offered the position. (Def.'s 56.1(a)(3) Statement ¶ 145, 147). Blake, the Administrator of the ERC, was not aware of Green's previous complaints of discrimination. (Id., ¶ 151). Green is aware of two DCFS workers who received PSA supervisory positions who had Masters Degrees in Guidance and Counseling. (Plaint.'s 56.1(b)(3) Statement ¶ 73).

In February 2002, Green requested a "hardship transfer" from Carrion's unit to another position at DCFS. (Def.'s 56.1(a)(3) Statement ¶ 152). Green sought the transfer from her current

14

team due to mental stress, harassment, unhealthy environment, working conditions, and verbal abuse from her supervisor. The request was denied. (Plaint.'s 56.1(b)(3) Statement ¶ 74). That same month, Green took a non-service-connected-disability leave of absence from DCFS. (Def.'s 56.1(a)(3) Statement ¶ 153). In a letter dated May 1, 2002, Green indicated her intention to resign from DCFS, effective May 13, 2002. (Id., ¶ 154). Green's new address in her letter of resignation was in Walls, Mississippi. (Id., ¶ 155). Prior to May 1, 2002, Green had decided to move to Mississippi and had already traveled there to find a place to live. (Id., ¶ 156). At the time she left DCFS, Green was seeing a counselor, therapist, psychiatrist, and a medical doctor. (Plaint.'s 56.1(b)(3) Statement ¶ 77).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

## Race Discrimination Claim

Green may prevail on her discrimination claim either through the "direct method" – showing intentional discrimination – or through the similar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (*Blise*). The direct method of proving discrimination requires the introduction of direct or circumstantial evidence of discrimination. Direct evidence requires, essentially, an admission by the defendant that the action was based on a prohibited animus. *See Blise*, 409 F.3d at 866. Green does not present direct evidence.

A plaintiff may also proceed under the direct method by constructing a "convincing mosaic" of circumstantial evidence that a jury could infer to be intentional discrimination. The circumstantial evidence must point directly to a discriminatory reason for the adverse action. *See Blise*, 409 F.3d at 866. Here, Green believes that Wert discriminated against her because of her race based on the way that Wert treated African-American employees and because she was disciplined for missing three team meetings only after complaining to Wert about the alleged discrimination.

As set out above, beginning in at least 1999, Green and Nichols believed that African-Americans were treated differently than non-African-Americans. Both Green and Nichols informed Wert and/or Hyde and/or McGrath and/or Lambert of the alleged discriminatory conduct by Wert. No corrective measures have been cited to end the alleged conduct. Following the March 8, 2000 meeting, Green attempted to resolve the issues and asked to be excused from further team meetings until the issues were resolved. Green's request went unanswered, but Green was subsequently disciplined for missing a total of three meetings. DCFS argues that Green's suspension does not evidence discrimination because the meetings were mandatory and no other employee "willfully"

16

missed the team meetings. However, it is undisputed that another non-African-American, Castro, had un-excused absences from meetings and was not similarly disciplined. Based on the alleged treatment of African-Americans and Green's suspension, genuine issues of material fact exist as to whether Green has demonstrated a "convincing mosaic" of circumstantial evidence that a jury could infer to be intentional discrimination.

Furthermore, genuine issues of material fact exist as to whether Green has demonstrated a *prima facie* case of race discrimination under the *McDonnell Douglas* framework. To establish a *prima facie* case of race discrimination under the *McDonnell Douglas* framework, Green is required to demonstrate that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir. 2001). If Green demonstrates a *prima facie* case, the burden shifts to DCFS to demonstrate "a legitimate, nondiscriminatory reason for the action." *Blise*, 409 F.3d at 867. If DCFS meets this burden, the burden shifts back to Green to demonstrate the proffered reason is pretextual. *Blise*, 409 F.3d at 867.

Green is a member of a protected class. A genuine issue of material fact exists as to whether Green's three-day suspension was an adverse employment action because it is not known whether the suspension was paid or unpaid. *See Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (unpaid suspension constitutes adverse employment action). In addition, genuine issues of material fact exist as to whether Green was performing her job satisfactorily and whether Castro is a similarly situated individual who was treated more favorably than Green. DCFS argues that Green was not meeting its legitimate expectations because Green willfully failed to attend three

17

mandatory team meetings. However, in light of Castro's also having unexcused absences from these same mandatory meetings and not being suspended, it cannot be concluded at this time that no reasonable jury could find that Green was meeting DCFS's legitimate expectations and that Castro was a similarly situated employee who was treated more favorably than Green.

DCFS's alleged nondiscriminatory reason for suspending Green was her failure to attend the three team meetings. A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995). A genuine issue of material fact exists as to whether DCFS's alleged nondiscriminatory reason for suspending Green is unworthy of credence because DCFS did not suspend Castro for similar conduct. Accordingly, Green has demonstrated genuine issues of material fact exist as to whether she has established a claim of racial discrimination under the *McDonnell Douglas* framework.

### Retaliation Claim

Title VII also prohibits an employer from retaliating against an employee that has complained of unlawful practices. *See* 42 U.S.C. § 2000e-3(a). An employee may present either direct or indirect evidence of retaliation. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (*Hilt-Dyson*).

Under the indirect methodology, a *prima facie* case of retaliation requires the plaintiff to demonstrate that: (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate

job expectations, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. If the plaintiff establishes a *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. Once the employer does this, the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason for termination is a pretext to retaliation. *See Hilt-Dyson*, 282 F.3d at 465.

The genuine issues of material fact that exist as to Green's race discrimination claim – whether Green was performing her job satisfactorily, whether she suffered an adverse employment action, whether she was treated less favorably than Castro who did not complain about discriminatory conduct, and whether DCFS's proffered reason for Green's suspension was pretextual – apply equally to Green's retaliation claim. Accordingly, summary judgment as to Green's retaliation claim is denied.

### Exhaustion of Administrative Remedies

Green also alleges that she was denied promotions for an ERC supervisory position and a PSA supervisory position. DCFS argues that Green failed to exhaust her administrative remedies as to these claims.

Title VII plaintiffs must initially bring a charge with the appropriate administrative body – *i.e.*, Equal Employment Opportunity Commission ("EEOC") or Equal Employment Office ("EEO") – before pursuing a claim in federal court; and, thus, Title VII claims cannot be brought if they were not included in the plaintiff's EEOC complaint. *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985) (*Babrocky*). An exception to this general rule, which allows a claim not included in the EEOC complaint to be pursued in federal court, exists when that

19

subsequent claim is "reasonably related" to the claim that was included in the EEOC charge. *Babrocky*, 773 F.2d at 864. This exception applies to retaliation claims if the alleged retaliation claim arose after the EEOC charge was filed. *See McKenzie v. Illinois Department of Transportation*, 92 F.3d 473, 482-483 (7th Cir.1996) (*McKenzie*). However, the retaliation claim, as with any claim that was not included in the EEOC charge and is later alleged in a complaint, must be similar or reasonably related to the allegations in the EEOC charge and grow out of those allegations. *See McKenzie*, 92 F.3d at 481-482; *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (*Cheek*). To be reasonably related, a factual relationship must exist between both claims; specifically, a claim in a Title VII plaintiff's complaint and an EEOC charge are reasonably related when the subsequent claim can be reasonably expected to be developed from an investigation of the allegations in the EEOC charge. *See Cheek*, 31 F.3d at 500. Claims are not alike or reasonably related if the EEOC charge and the complaint do not describe the same conduct and implicate the same individuals. *See McKenzie*, 92 F.3d at 481.

Green's EEOC charge did not include the denial of the ERC supervisory position, which had occurred prior to Green's filing her EEOC charge. Accordingly, Green failed to exhaust her administrative remedies as to that promotion. Furthermore, Green's present claim based on her failure to receive the PSA supervisor promotions do not describe the same conduct and do not implicate the same individuals of that included in the EEOC charge. Accordingly, the rejections of the PSA supervisory positions are also barred. *See Geldon v. South Milwaukee Sch. Dist.*, 414 F.3d 817, 820 (7th Cir. 2005).

20

Green also alleges that she was constructively discharged in retaliation of her complaints of discrimination. DCFS argues that these claims are also barred because Green failed to exhaust her administrative remedies as to these claims.

Green's allegation that she was constructively discharged in retaliation for filing a charge of discrimination was also not included in her EEOC charge and is not reasonably related to the allegations in her EEOC charge. As fully set forth above, Green did not have any contact with Wert since August 2000. Although Green alleges that she received similar discriminatory treatment by supervisors after Wert, the events leading to her alleged constructive discharge in April/May 2002, more than a year after she was supervised by Wert, do not describe the same conduct and do not implicate the same individuals as alleged in Green's EEOC charge. Accordingly, the alleged constructive discharge that was not included in the EEOC charge cannot support a claim of retaliation.

## Hostile Work Environment Claim

To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate: (1) the workplace was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment; (2) the harassment was based on plaintiff's race; (3) the plaintiff perceived the work environment to be hostile or abusive; (4) a reasonable person would have perceived the work environment to be hostile or abusive; and (5) the employer knew or reasonably should have known that the plaintiff was being subjected to such treatment, and it did not take appropriate corrective action. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (7th Cir.1999).

For harassment to be actionable under Title VII, the employer's actions must be sufficiently severe or pervasive so as to "alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 477 U.S. 57, 67 (1986). Title VII is not directed against unpleasantness *per se* but, rather, against discrimination in the conditions of employment. *Drake v. Minnesota Mining & Mfg. Co.*, 143 F.3d 878, 885 (7th Cir. 1998), *quoting Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir. 1994). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (*Harris*).

Green alleges that the numerous actions taken against her by Wert, taken together, constitute a hostile work environment.[1] These actions include that Wert: ignored Green's comments in team meetings and regularly sought input from non-African-Americans, conducted private meetings with non-African-Americans, contacted Green five or six times while Green was visiting an adoptive family, transferred Green's case files to other team members so Green would not receive credit for closing the case file, wrongly granted subsidies to Caucasian families and denied subsidies to African-American families, and made negative comments on Green's 2000 performance review. With the exception of the one "needs improvement" finding in Green's 2000 performance review, Green fails to identify any times, dates, or places that Wert allegedly took these actions that Green

---

[1]Green's Second Amended Complaint does not include a separate claim of a hostile work environment. Green's response to DCFS's Motion for Summary Judgment does not include a section dedicated to a hostile-work-environment claim. Instead, in her response addressing her race discrimination claim and the existence of an adverse employment action, Green argues that DCFS's conduct constituted a hostile work environment.

contends created a hostile work environment. Instead, Green offers conclusory statements by her and Nichols that Wert created a hostile work environment. However, conclusory statements not grounded in specific facts are insufficient to avoid summary judgment. *See Lucas v. Chicago Transit Authority*, 367 F.3d 714, 726 (7th Cir. 2004) (*Lucas*) (affirming summary judgment as to plaintiff's hostile work environment claim because plaintiff failed to present any specific times, dates or places which led to plaintiff's conclusions that work environment was hostile because African-Americans were treated "more harshly" as demonstrated by African-Americans – being asked to change rail ties more frequently, working longer sections of track, and being written up for reasons that non-African-Americans were not). With only these general conclusory statements, it is not possible to determine the frequency of the claimed discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with Green's work performance. *See Harris*, 510 U.S. at 23; *Lucas*, 367 F.3d at 726.

Similarly, Green makes conclusory allegations as to the hostile environment in the Licensing Unit under Camacho's and Carrion's supervision. Green alleges that Camacho threw paperwork at her, did not invite her to lunch, yelled and hollered at her and did not holler at her co-worker. These conclusory allegations do not support a claim for a hostile work environment. *See Harris*, 510 U.S. at 23; *Lucas*, 367 F.3d at 726. Accordingly, summary judgment is granted as to Green's hostile-work-environment claim.

23

## CONCLUSION

For the reasons stated above, DCFS's Motion for Summary Judgment is granted in part and denied in part. Summary judgment is granted as to Green's retaliation claim based on failure to promote and constructive discharge and as to Green's hostile work environment claim. Summary judgment is denied as to Green's race discrimination claim and retaliation claim based on Green's three-day suspension.

Dated: June 27 2006

JOHN W. DARRAH
United States District Court Judge